776 So.2d 233 (2000)
Jesus DELGADO, Appellant,
v.
STATE of Florida, Appellee.
No. SC88638.
Supreme Court of Florida.
August 24, 2000.
Roy D. Wasson, Miami, Florida, and Rev. Melodee A. Smith, Coral Gables, Florida, for Appellant.
Robert A. Butterworth, Attorney General, and Carolyn M. Snurkowski, Tallahassee, Florida, and Fariba N. Komeily, and Lisa Rodriguez, Miami, Florida, Assistant Attorneys General, for Appellee.

*234 REVISED OPINION

PER CURIAM.
Jesus Delgado appeals his convictions on two counts of first-degree murder and the judgment of the trial court imposing a sentence of death on each count. In addition, appellant challenges his conviction of armed burglary. We have jurisdiction pursuant to article V, section 3(b)(1), of the Florida Constitution. For the reasons expressed below, we remand for a new trial. The trial record establishes the following facts. Marlene McField was a neighbor of Tomas and Violetta Rodriguez, the victims in this case. In the early evening hours of August 30, 1990, Ms. McField witnessed the Rodriguezes arrive home. Later, at around 10 p.m., Ms. McField remembered hearing dogs in the home directly behind the Rodriguezes' home wailing in an unusual fashion.
The following morning, Ms. McField went to the Rodriguezes' home and noticed that the gate leading to the Rodriguezes' front porch was ajar; the key was still in the lock on the inside portion of the gate. Ms. McField removed the key from the gate and entered the front porch area. She then rang the doorbell, but no one answered. Knowing that the Rodriguezes were extremely security-conscious people, Ms. McField became suspicious and summoned the police.
When the police arrived, they discovered that the front door was unlocked. The first officer on the scene did not notice any sign of a forced entry. Inside, police secured the bedrooms and living room area first. Nothing in those areas indicated anything unusual. As the police moved toward the kitchen, they noticed a bloodstained knife and a pistol lying on the floor.
The kitchen, utility room, and garage did exhibit signs of a possible struggle. The utility room connects the kitchen and the garage. A wooden door leading from the utility room into the garage was cracked in the center and its hinges were broken. Mr. Rodriguez's body was discovered next to this door, just inside the garage. His body had bullet and stab wounds. Ms. Rodriguez's body was also discovered in the garage; it was wedged between a car and the garage wall. Her body had blunt force trauma and stab wounds.
In the kitchen, two cabinet drawers were open. The knife which police found was similar to a set found in one of the open kitchen drawers. A single set of bloody shoe-print impressions led from the garage into the kitchen and up to these drawers. Mr. Rodriguez was found without shoes and the soles of Ms. Rodriguez's slippers did not match the bloody impressions.
The pistol found next to the knife, a .22 caliber Ruger semiautomatic, was equipped with a silencer. Police could not trace the pistol because its serial number had been removed. Police did recover six.22 caliber shell casings that were later determined to have been fired from the Ruger. No other .22 caliber ammunition was found at the home. Police also found a .38 caliber revolver, which belonged to Mr. Rodriguez, in a zippered pouch inside a closed cabinet in the master bedroom. Testing on the revolver revealed it had not been fired. The State presented an expert who testified that tests performed on the victims' hands indicated that neither had triggered a firearm.
A single drop of only appellant's blood was found in the garage. A mixture of appellant's and the victims' blood was found in the garage, on the handgun, at the base of the kitchen phone that hung from a wall, and on the kitchen phone itself. Appellant's palm print was discovered on the kitchen phone. The police determined that the last call on this phone was made to Barbara Lamellas' home, where appellant resided at the time.
In addition to the physical evidence gathered from the scene, police learned that appellant and the Rodriguezes knew each other and had recently experienced *235 difficulties as a result of a business transaction between the Rodriguezes and Horatio Lamellas. In June of 1990, the Rodriguezes sold their dry cleaning business to Horatio Lamellas. After the purchase, Barbara Lamellas, Horatio Lamellas' daughter, and appellant, Ms. Lamellas' boyfriend, ran the business.
Maria Hernandez worked at the dry cleaning business before and after the sale to Mr. Lamellas. Ms. Hernandez testified that after the sale she observed appellant complaining that the machines were not working properly and about dissatisfied customers. According to Ms. Hernandez, appellant stated that the Rodriguezes had "tricked him with the machines, and the business they had sold them." Ms. Hernandez stated that while the Rodriguezes were in charge, business was steady and the machines worked well.
Based on this information regarding the dry cleaning business and the evidence found at the home, appellant became a suspect. Appellant was not located and apprehended by police until December 23, 1992, more than two years after the murders.
On July 27, 1993, a grand jury indicted appellant on two counts of first-degree murder and one count of armed burglary. The petit jury found appellant guilty on all counts. After a penalty-phase proceeding, the same petit jury recommended by a seven-to-five vote that appellant be sentenced to death for the murder of Mr. Rodriguez and by a vote of twelve to zero that appellant be sentenced to death for the murder of Ms. Rodriguez. Regarding Mr. Rodriguez, the trial court found two aggravating circumstances: prior violent felony and murder committed during an enumerated felony (armed burglary). Regarding Ms. Rodriguez, the court found three aggravating circumstances: prior violent felony, murder committed during an enumerated felony (armed burglary), and heinous, atrocious, or cruel (HAC). The court found no statutory mitigation. The court found the following nonstatutory mitigation: Appellant suffered from serious life-long physical and psychological impairments (limited weight); appellant was a physically and emotionally battered child (substantial weight); appellant never used drugs (some weight); appellant's father was sentenced in 1989 to thirty years in federal prison for drug trafficking (some weight); appellant loves his family (moderate weight); appellant has had little contact with his mother since 1990 (little weight); appellant has the capacity to work hard and other fine qualities (some weight); and appellant's excellent behavior throughout trial (some weight). After weighing the relevant factors, the court sentenced appellant to death for each murder and to life for the armed burglary.
Appellant raises fourteen issues on appeal.[1] We find one issue dispositive in this case. Appellant claims that the trial court erred in denying his motion for judgment *236 of acquittal on the charges of first-degree murder. Specifically, appellant argues that the State's theory of felony murder should not have been presented to the jury. We agree. After the State rested its case-in-chief, defense counsel moved the court for a judgment of acquittal on all counts of first-degree murder. Counsel argued that the State's theory of felony murder was flawed and therefore should not be presented to the jury and that the State had failed to introduce sufficient evidence of premeditation. The court denied the motion, allowing the State to argue both felony murder and premeditation in support of the first-degree murder charges.
The underlying felony that supported the State's case for felony murder was burglary. Regarding the burglary, the indictment stated that appellant entered or remained in the victims' dwelling with the intent to commit murder. The State prosecuted this case on the premise that appellant's entry into the victims' home was consensual (i.e., appellant was invited to enter the victims' home) but that at some point, this consent was withdrawn. Section 810.02(1), Florida Statutes (1989), states:
Burglary means entering or remaining in a structure or a conveyance with the intent to commit an offense therein, unless the premises are at the time open to the public or the defendant is licensed or invited to enter or remain.

(Emphasis added.) This Court has construed the consent clause (beginning with "unless") to be an affirmative defense to burglary. See State v. Hicks, 421 So.2d 510 (Fla.1982). Thus, the burden is on the defendant to establish that there was consent. See id. The defendant can establish that: (1) the premises were open to the public, (2) the defendant was a licensee, or (3) the defendant was an invitee.
Recently, in Miller v. State, 733 So.2d 955, 957 (Fla.1999), this Court held "that if a defendant can establish that the premises were open to the public, then this is a complete defense." Consistent with our holding in Miller, if a defendant can establish either that the premises were open to the public or that the defendant was an invitee or licensee, then the defendant has a complete defense to the charge of burglary. After examining the origins of the crime of burglary, we find that this conclusion is necessary to fulfill the purpose for which the crime of burglary was intended.
At common law, burglary was defined as breaking and entering the dwelling house of another at night with the intent to commit a felony therein. See Model Penal Code, § 221.1 cmt. 1 at 61 (1980). The commentary to the Model Penal Code explains that the crime of burglary developed due to an effort to compensate for defects in the common law crime of attempt. See id. at 62-63. Over time, the definition of burglary has been expanded as a result of judicial interpretation and legislation. The following definition of burglary was approved in 1962 for the Model Penal Code:
(1) Burglary Defined. A person is guilty of burglary if he enters a building or occupied structure, or separately secured or occupied portion thereof, with purpose to commit a crime therein, unless the premises are at the time open to the public or the actor is licensed or privileged to enter. It is an affirmative defense to prosecution for burglary that the building or structure was abandoned.
Id. § 221.1(1) at 60-61. The commentary explains that this definition attempted to limit the reach of the crime:

The offense has thus been limited in the Model Code to the invasion of premises under circumstances especially likely to terrorize occupants. Most of the extensions of the offense that have been added by legislation over the years have been discarded.
Id. cmt. 2 at 67 (emphasis added).
The comment also addresses the concept of unprivileged entry. The comment *237 urges those states that have adopted the concept of "remaining in" within their statutes to limit the language to narrow circumstances involving a suspect who surreptitiously remains in premises after consensual entry:
There is a difficulty with the ["remains unlawfully"] language, however, that should lead to its rejection. As the Brown Commission pointed out, it literally would include "a visitor to one's home ... who becomes involved in an argument with his host, threatens to punch him in the nose, and is asked to leave; if he does not leave, but continues his threatening argument, he would ... be guilty of burglary." For this reason, the Final Report of the Brown Commission included in the burglary offense one who entered or "surreptitiously" remained without license or privilege.

Id. cmt. 3(a) at 68-71 (emphasis added) (footnote omitted). Other scholars agree that the "remaining in" language found in some state statutes should have limited application:
This common statutory expansion in the definition of burglary makes great sense. A lawful entry does not foreclose the kind of intrusion burglary is designed to reach, as illustrated by the case of a bank customer who hides in the bank until it closes and then takes the bank's money. Moreover, this expansion forecloses any argument by a defendant found in premises then closed that he had entered earlier when they were open. But for this expansion not also to cover certain other situations in which the unlawful remaining ought not be treated as burglary, it is best to limit the remaining-within alternative to where that conduct is done surreptitiously.
2 Wayne R. LaFave & Austin W. Scott, Jr., Substantive Criminal Law, § 8.13(b) at 468 (1986) (citations omitted); see also 2 Working Papers of the National Commission on Reform of Federal Criminal Laws 894 (1970), quoted in 3 Charles E. Torcia, Wharton's Criminal Law § 329, at 198 n.29 (14th ed.1980).[2]
New York, like Florida, has included the "remaining in" language within its burglary statute. See N.Y. Penal Law § 140.00(5) (McKinney 1999). A review of New York case law reveals that the statute is being interpreted consistent with the commentary of the Model Penal Code. In People v. Hutchinson, 124 Misc.2d 487, 477 N.Y.S.2d 965, 968 (Sup.Ct.1984), aff'd, 121 A.D.2d 849, 503 N.Y.S.2d 702 (App.Div. 1986), appeal denied, 68 N.Y.2d 770, 506 N.Y.S.2d 1054, 498 N.E.2d 156 (1986), the court held that once a person is lawfully on the premises, "there must be something more to establish termination of license than the commission of a criminal act or an order to leave after a criminal intention is manifested." The State argued that a defendant violated this statute when he entered a private home with permission but subsequently pulled a knife on the owner. The State reasoned that upon pulling the knife, any consent was automatically revoked. The court rejected this argument and reasoning, holding that if a criminal defendant entered with consent, his subsequent commission of a criminal act alone could not convert a lawful entry into an unlawful remaining sufficient to sustain a burglary charge. The court stated:
[The State's] reasoning impermissibly broadens the scope of liability for burglary, making a burglar of anyone who commits a crime on someone else's premises. It erroneously merges two separate and independent elements that must coexist to establish burglary: First, the trespassory element of entry *238 or remaining without license or privilege; Second, intent to commit a crime. An intrusion without license or privilege (unlawful entry) is the distinguishing element, the essence of burglary. It must be established separately and distinctly from the intention to commit a crime. The mere fact that a crime was committed or was intended is an insufficient basis for finding that the entry or remaining was without privilege or authority.
Id. at 967. The court recognized that the State was improperly using the criminal act to prove both intent and revocation of license or privilege. The court further stated:
If this jury concludes that the defendant was in the complainant's apartment with genuine license, that is, with her consent obtained without deceit, the fact that he was unwelcome after he pulled the knife does not convert his licensed entry into an unlawful remaining. His licensed presence there is not revoked by the commission of a criminal act.
Id. at 968. In People v. Gaines, 74 N.Y.2d 358, 547 N.Y.S.2d 620, 546 N.E.2d 913, 915 (1989), the court addressed the addition of the "remains unlawfully" language in the New York statute, and stated that "the Legislature was plainly addressing a different factual situation-not one of unlawful entry but of unauthorized remaining in a building after lawful entry (as a shoplifter who remains on the store premises after closing)."
The issue for this Court to consider is whether the phrase "remaining in" found in Florida's burglary statute should be limited to situations where the suspect enters lawfully and subsequently secretes himself or herself from the host. Up until now, Florida courts have refused to make such a limiting interpretation. In Ray v. State, 522 So.2d 963, 965 (Fla. 3d DCA 1988), the Third District Court of Appeal developed the idea that consent can be withdrawn: "Otherwise stated, once consensual entry is complete, a consensual `remaining in' begins, and any burglary conviction must be bottomed on proof that consent to `remaining in' has been withdrawn."
We agree with much of the Third District Court's reasoning, particularly the statement that "[i]t is undeniably true that a person would not ordinarily tolerate another person remaining in the premises and committing a crime, and that when a victim becomes aware of the commission of a crime, the victim implicitly withdraws consent to the perpetrator's remaining in the premises." Id. at 966. Yet, after coming to this conclusion, the Third District Court would still require the State to produce circumstantial evidence to establish that consent has been withdrawn. See id. at 967 ("Therefore, we agree with the State that Bryant's struggle with the defendant was sufficient evidence that she withdrew her consent to Ray's remaining in the premises, making his remaining in the premises after the withdrawal a burglary."). Such a procedure has obvious faults.
First, if we are certain that "a person would not ordinarily tolerate another person remaining in the premises and committing a crime," then it would not be logical to require the State to produce circumstantial evidence of this fact. Yet, this Court has recently followed the Ray reasoning in a number of cases to conclude that circumstantial evidence sufficiently established that consent had been withdrawn. See Raleigh v. State, 705 So.2d 1324, 1329 (Fla.1997) ("There is ample circumstantial evidence from which the jury could conclude that [the victim] withdrew whatever consent he may have given for [the defendant] to remain when [the defendant] shot him several times and beat him so viciously that his gun was left bent, broken, and bloody."); Jimenez v. State, 703 So.2d 437, 441 (Fla.1997) ("In the instant case, we conclude that the trier of fact could reasonably have found proof of withdrawal of consent beyond a reasonable doubt. There is ample circumstantial evidence *239 from which the jury could conclude that [the victim] withdrew whatever consent she may have given for [the defendant] to remain, when he brutally beat her and stabbed her multiple times...."); Robertson v. State, 699 So.2d 1343, 1346-47 (Fla.1997) ("There was ample circumstantial evidence from which the jury could conclude that the victim of this brutal strangulation-suffocation murder withdrew whatever consent she may have given Robertson to be in her apartment.").
More importantly, if we make the assumption that "a person would not ordinarily tolerate another person remaining in the premises and committing a crime," and assuming that this withdrawn consent can be established at trial, a number of crimes that would normally not qualify as felonies would suddenly be elevated to burglary. In other words, any crime, including misdemeanors, committed on another person's premises would become a burglary if the owner of the premises becomes aware that the suspect is committing the crime. Obviously, this leads to an absurd result. For example, if a person hosts a party and catches an invitee smoking marijuana on the premises, the invitee is not only guilty of a misdemeanor marijuana charge but also of burglary, a second-degree felony. The same can be said of the invitee who writes a bad check for pizza in front of an aware host. The other extreme is also true. An invitee who commits second-degree murder on another person's premises and in the presence of an aware host could be charged with first-degree felony murder, with the underlying felony being burglary. The possibility exists that many homicides could be elevated to first-degree murder, merely because the killing was committed indoors.[3]
The question before this Court is whether the Legislature intended to criminalize *240 the particular conduct in this case as burglary when it added the phrase "remaining in" to the burglary statute.[4] The Third District Court in Ray correctly pointed out that some meaning must be given to the phrase "remaining in." See 522 So.2d at 967 ("Just as the consent defense must be given meaning, so must the "remaining in" alternative."). Yet, in giving meaning to the phrase "remaining in," the Third District Court has effectively wiped out the clause "unless ... the defendant is licensed or invited to enter." Under the Third District Court's reasoning, even if a defendant was licensed or invited to enter, the moment he or she commits an offense in the presence of an aware host, a burglary is committed. Therefore, in order to give meaning to the entire burglary statute (the "remaining in" clause and the "unless" clause), the "remaining in" clause should be limited to the defendant who surreptitiously remains.
The Third District Court pointed out that the word surreptitiously does not appear in the statute and that a court should not inject words into statutes that were not placed there by the Legislature. See id. at 967 ("[W]e are bound to construe our statute as written and not add to it a word"surreptitiously"not placed there by the Legislature."). Of course, the New York statute does not contain the word surreptitiously, yet the New York courts have concluded that the statute should be limited to such situations. Further, as demonstrated by New York's interpretation and the Third District Court's in Ray, the "remaining in" clause is subject to different interpretations. In section 775.021(1), Florida Statutes (1997), the Legislature mandated that courts use the following rule of construction:
The provisions of this [criminal] code and offenses defined by other statutes shall be strictly construed; when the language is susceptible of differing constructions, it shall be construed most favorably to the accused.
Applying this principle to the present case, the most favorable interpretation of Florida's burglary statute is to hold that the "remaining in" language applies only in situations where the remaining in was done surreptitiously. This interpretation is consistent with the original intention of the burglary statute. In the context of an occupied dwelling, burglary was not intended to cover the situation where an invited guest turns criminal or violent. Rather, burglary was intended to criminalize the conduct of a suspect `who terrorizes, shocks, or surprises the unknowing occupant. Many other states that have the "remaining in" language in their burglary statutes have included the word surreptitiously or similar language in the statute.[5]
As stated earlier, consensual entry is an affirmative defense to the charge of burglary, and therefore the burden is on the defendant to establish that there was consent to enter. See Hicks, 421 So.2d 510. Evidence presented by the State can also establish a defendant's affirmative defense. See B.D.K. v. State, 743 So.2d 1155, 1158 (Fla. 2d DCA 1999). In the present case, there exists sufficient evidence in the record that appellant met his burden of establishing consensual entry.[6] We are *241 cognizant that after appellant entered the victims' home, he is accused of committing two heinous murders. Regardless of whether these accusations are true, appellant's actions are not the type of conduct which the crime of burglary was intended to punish. Our decision in no way prevents the State from prosecuting appellant for whatever crimes he may have committed once inside the victims' home. But considering both the record in this case and the State's theory of the crime, appellant's conduct does not amount to burglary.
By our holding today, we recede from this Court's previous opinions in Robertson, Jimenez, and Raleigh, a decision which we do not undertake lightly. While we are aware of the importance of stare decisis, this principle must give way to common sense and logic. See Smith v. Department of Insurance, 507 So.2d 1080, 1096 (Fla.1987) ("Perpetuating an error in legal thinking under the guise of stare decisis serves no one well and only undermines the integrity and credibility of the court.") (Ehrlich, J., concurring in part, dissenting in part). It is now apparent that the Ray doctrine leads to an absurd result. See State v. Gray, 654 So.2d 552 (Fla.1995) (concluding that there is no crime of attempted felony murder).
This opinion will not, however, apply retroactively to convictions that have become final. See Witt v. State, 387 So.2d 922, 928-31 (Fla.1980).[7]
Our holding on the burglary issue compels us to remand this case for a new trial. In Yates v. United States, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957), the Supreme Court held that a conviction under a general verdict is improper when it rests on multiple bases, one of which is legally inadequate. In Griffin v. United States, 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991), the Supreme Court clarified that the Yates rule did not apply when the alternative ground was legally proper but failed because of insufficient evidence. See also San Martin v. State, 717 So.2d 462, 470 (Fla.1998) ("While a general guilty verdict must be set aside where the conviction may have rested on an unconstitutional ground or a legally inadequate theory, reversal is not warranted where the general verdict could have rested upon a theory of liability without adequate evidentiary support when there was an alternative theory of guilt for which the evidence was sufficient."). The Griffin court explained the distinction between a legally inadequate theory and a factually insufficient theory:
Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to lawwhether, for example, the action in question is protected by the Constitution, is time barred, or fails to come within the statutory definition of the crime. When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error. Quite the opposite is true, however, when they have been left the option of relying upon a factually inadequate theory, since jurors are well equipped to analyze the evidence, see Duncan v. Louisiana, 391 U.S. 145, 157[, 88 S.Ct. 1444, 20 L.Ed.2d 491] (1968). As the Seventh Circuit has put it:
It is one thing to negate a verdict that, while supported by evidence, may have been based on an erroneous view of the law; it is another to do so merely on the chanceremote, it *242 seems to usthat the jury convicted on a ground that was not supported by adequate evidence when there existed alternative grounds for which the evidence was sufficient. United States v. Townsend, 924 F.2d 1385, 1414 ([7th Cir.] 1991).
Griffin, 502 U.S. at 59-60, 112 S.Ct. 466.
This is not a case where there was merely insufficient evidence to support the burglary charge. The jury in this case was instructed that a defendant can be found guilty of burglary, even if the initial entry was consensual, if the victims later withdrew their consent. This theory of burglary was also relied on by the State as the underlying felony to support the felony murder charge. Pursuant to our analysis in today's opinion, such a theory of burglary (and felony murder) is legally inadequate.
Accordingly, for the above-stated reasons, we remand this case for a new trial.
It is so ordered.
SHAW, HARDING, ANSTEAD and PARIENTE, JJ., concur.
WELLS, C.J., dissents with an opinion, in which LEWIS and QUINCE, JJ., concur.
WELLS, C.J., dissenting.
I dissent from the majority's setting aside of the convictions for the murders of Mr. and Mrs. Rodriguez. I dissent from the reversal of the conviction for armed burglary.
I write to explain that I believe the majority seriously errs in unsettling the law of burglary. Though the majority pays a passing tribute to stare decisis, it does what the doctrine of stare decisis is intended to prevent-it destabilizes the law. The law in respect to the "remaining in" part of the burglary statute has been settled in Florida since 1983 by this Court's decision in Routly v. State, 440 So.2d 1257 (Fla.1983), and, in respect to the withdrawal of the "remaining in" consent, since 1988 by the decision in Ray v. State, 522 So.2d 963, 965 (Fla. 3d DCA 1988). This Court plainly accepted this as settled law by affirming it in Raleigh v. State, 705 So.2d 1324, 1329 (Fla.1997); Jimenez v. State, 703 So.2d 437, 440 (Fla.1997); and Robertson v. State, 699 So.2d 1343, 1346-47 (Fla. 1997). Unsettling well-settled legal principles is extremely disruptive in the criminal justice system, a lesson we learned again and again from this Court's about-face in State v. Gray, 654 So.2d 552 (Fla.1995).
The majority recognizes that this issue is one of statutory interpretation. Since the majority cannot reach its result through the acceptance of the plain language of the burglary statute, the majority resorts to writing a change in the statute by inserting the word "surreptitiously" into the statute. As pointed out earlier, this Court and the appellate courts of this state have interpreted this statute contrary to the present interpretation since 1984 and 1988. Since those dates, there have been yearly legislative sessions. The Legislature has not evidenced any doubt that these long-standing statutory interpretations are in accord with legislative intent. The fact that the Legislature has not acted in so many sessions according to this Court's precedent indicates that the Legislature approved or accepted the construction placed upon the statute. See Johnson v. State, 91 So.2d 185, 187 (Fla. 1956); White v. Johnson, 59 So.2d 532, 533 (Fla.1952). I must conclude that this precedent is now also cast aside. In view of this decision by the majority, I believe the Legislature needs to immediately review and plainly express whether it accepts the majority's construction of this statute.
The present majority decides against our State's precedent in favor of the precedent of the State of New York in People v. Gaines, 74 N.Y.2d 358, 547 N.Y.S.2d 620, 546 N.E.2d 913, 915 (1989), and in favor of a dissent by a member of the Supreme Court of Alabama in Davis v. State, 737 So.2d 480 (Ala.1999). However, I would *243 follow what the majority stated in the Alabama decision:
In [Ex parte Gentry, 689 So.2d 916 (Ala. 1996)], this Court overruled a line of precedents holding that evidence of a struggle and a murder inside the victim's dwelling was sufficient to establish that any initial license to enter had been withdrawn. Gentry served a valid purpose in condemning a finding of burglary merely from the commission of a crime that could not be deemed to be within the scope of the privilege to enter. To hold otherwise would have converted every privileged entry followed by a crime into a burglary, thereby running afoul of the constitutional requirement of reserving capital punishment for only the most egregious crimes. However, in sweeping out mere evidence of the commission of a crime following privileged entry, this Court condemned the use of evidence of a struggle as indicium of revocation of the defendant's license or privilege to remain. In so doing the Court swept with too broad a broom.
Id. at 483 (citations omitted). In this case, the victim's body was found inside her mobile home. The cause of death was a ligature strangulation. The victim also received three nonfatal stab wounds in her neck. There were no signs of a forced entry. The defendant's fingerprints were found on the scene, and the defendant knew the victim. The court concluded that this evidence was sufficient to make revocation of consent an issue for the jury.
Evidence of a struggle that gives rise to circumstantial evidence of revocation of a license or privilege can be used to show an unlawful remaining, a separate prong of the offense of burglary upon which a conviction can be based.
Id. at 483-84. See also People v. Ager, 928 P.2d 784, 790 (Colo.Ct.App.1996); Hambrick v. State, 174 Ga.App. 444, 330 S.E.2d 383 (1985) ("When Hambrick's ulterior purpose beyond the bounds of a friendly visit became known ... and [the victim] reacted against it, a reasonable inference could be drawn that the authority to remain ended. Arrington did not have to shout `Get out!' for this to be so. Yet Hambrick remained until he got possession of the money, far beyond the time at which the scope of the permission ended."); State v. Steffen, 31 Ohio St.3d 111, 509 N.E.2d 383, 389 (1987) ("[e]ven assuming lawful initial entry, the jury was justified in inferring from the evidence that appellant's privilege to remain in Karen's parents' home terminated the moment he commenced his assault on her."). This is in accord with our own precedent. I would follow our State's precedent and that of the above-referenced states.
In sum, in Jimenez and Raleigh, this Court held that the facts were sufficiently established in respect to whether consent had been withdrawn so that the issue was properly decided by a jury. That is the correct decision for this case. Therefore, I do not join the majority in respect to its decision except that I do agree that its opinion not apply retroactively.
LEWIS and QUINCE, JJ., concur.
NOTES
[1] Appellant's issues are as follows: (1) whether the trial court erred in denying appellant's motion for a judgment of acquittal on the felony murder charges; (2) whether the trial court erred in denying appellant's motion for mistrial after the State commented on appellant's failure to testify and attempted to shift the burden of proof; (3) whether the trial court erred in denying appellant's motion for judgment of acquittal on the premeditated murder charges; (4) whether the trial court erred in excusing qualified prospective jurors; (5) whether the trial court erred in admitting certain photographic evidence; (6) whether the trial court failed to provide appellant with a competent mental examination; (7) whether the trial court failed to follow the procedure required when a defendant waives mitigation evidence; (8) whether the trial court erred in failing to grant appellant's motion for mistrial after the State made improper remarks during its penalty-phase closing argument; (9) whether the trial court erred in its instructions to appellant's penalty-phase jury; (10) whether the trial court erred in allowing victim impact evidence to be presented to the jury; (11) whether death is a disproportionate sentence; (12) whether the trial court erred in failing to assign adequate weight to mitigating evidence; (13) whether the cumulative effect of the errors denied appellant a fundamentally fair proceeding; and (14) whether the death penalty is unconstitutional.
[2] Working Papers states:

When a person comes onto property by lawful means, he remains criminally accountable only for the acts he thereafter performs on the property, but his entry in itself imposes no special terror or invasion of privacy on the property holder so as to render the culprit guilty of burglary.
Id.
[3] We find persuasive the reasoning in Justice Almon's dissent in Davis v. State, 737 So.2d 480, 484-86 (Ala.1999) (Almon, J., dissenting) (footnote omitted), wherein he stated:

[The majority's] construction [of "remains unlawfully"] has the potential to make almost every murder committed indoors a capital murder, and nearly every crime that occurs indoors can be bootstrapped into a burglary simply by the fact of the commission of the crime....
. . . .
As to the burglary/murder conviction, the majority of this Court is allowing a murder conviction to be made capital by allowing a jury to draw an inference of an implied revocation of a privilege to remain. Is an inference of an implied revocation a basis on which to "`genuinely narrow' the class of persons eligible for the death penalty so that capital punishment is reserved for the most egregious crimes"? Gentry III, 689 So.2d at 917, quoting Zant v. Stephens, 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235, 249-50 (1983).
The majority says that the difference between a capital crime and a noncapital murder in this context is whether there is evidence that the victim's death was "inflicted by surprise or stealth [and caused] instantaneous death," in which case the court could not submit the capital-burglary/murder charge to the jury because there would not be "circumstantial evidence of an unlawful remaining." 737 So.2d at 484. I foresee great difficulty in drawing the line between a capital-burglary/murder case, in which the inference of an implied revocation will be supported, and a noncapital case of an indoor murder, in which that inference will not be supported by the evidence. Moreover, this distinction is an inappropriate basis on which to distinguish "the most egregious crimes" from those that are not made capital.
. . . .
... An inference that the victim "probably" communicated a revocation of privilege is just as tenuous as an inference of an implied revocation.... Does the majority allow an inference that the victim told Davis to leave before he wrapped the cord around her neck, or an inference that, while he was strangling her, she somehow communicated the revocation of his privilege to remain, or does the majority simply hold that her struggle for life was an implied revocation of his privilege to be in her home?
These inferences that the majority is allowing concern me. Essentially, a defendant is being "guessed" into a capital conviction.... Alternatively, perhaps the majority thinks that killing a person in the victim's home should be a capital murder. However, there is no capital offense of "murder of a person in the person's home."
[4] Florida's current definition of burglary was enacted in 1975. See ch. 74-383, section 31, Laws of Fla. The previous definition did not contain the "remaining in" language. See § 810.01, Fla. Stat. (1973).
[5] See Me.Rev.Stat. Ann. tit. 17-A, § 401 (West 1983); N.J. Stat. Ann. § 2C:18-2 (West 1995); N.D. Cent.Code § 12.1-22-02(1) (1997); Vt. Stat. Ann. tit. 13, § 1201 (1998). See also S.C.Code Ann. § 16-11-310 (Law Co-op. Supp.1998); Tex. Penal Code Ann. § 30.02 (West 1994); Va.Code Ann. § 18.2-90 (Michie Supp.1999).
[6] In addition to the testimony from the police that there were no signs of a forced entry, a review of the record reveals that the State made numerous remarks throughout the trial which indicate that its theory was withdrawn consent after entry: "A burglary requires a remaining in after such time as consent has been withdrawn ... Someone comes to your house initially, you let them in, and they become loud or boisterous ... and you just don't want them there anymore," "Tomas Rodriquez did not hate or have any problems with Jesus Delgado, after all he let him in," and "Burglary was established at the time the defendant chose to remain in that house against the will of Violetta and Tomas Rodriguez."
[7] The instant case does not meet the second or third prongs of the Witt test.