859 So.2d 486 (2003)
Paul FITZPATRICK, Appellant,
v.
STATE of Florida, Appellee.
No. SC00-2589.
Supreme Court of Florida.
September 11, 2003.
Rehearing Denied October 31, 2003.
*487 James Marion Moorman, Public Defender, and Douglas S. Connor, Assistant Public Defender, Tenth Judicial Circuit, Bartow, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, and Robert J. Landry, Assistant Attorney General, Tampa, FL, for Appellee.
PER CURIAM.
We have on appeal a judgment of conviction of first-degree murder and a sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we reverse appellant's conviction, vacate his sentence, and remand for a new trial.

FACTS AND PROCEDURAL HISTORY
On September 17, 1996, the grand jury indicted appellant, Paul John Fitzpatrick, for the premeditated murder of Gerald D. Hollinger. The charges against Fitzpatrick resulted from the stabbing death of Hollinger, who was found dead on February 8, 1980, inside his Pinellas County home. Fitzpatrick was tried February 14, 2000, through February 18, 2000, and found guilty of first-degree murder. The jury recommended death by an eight-to-four majority. Fitzpatrick maintained his innocence at trial, and in a posttrial statement to the sentencing court attributed his conviction to the perjured testimony of the State's witness, Paul Brown. On September 13, 2000, the trial court sentenced appellant to death. This direct appeal followed.
At trial, officers from the local sheriff's department testified that they found Hollinger's body lying on the kitchen floor of his residence in a large pool of blood. The medical examiner testified that there were forty-one stab wounds on his body, including several wounds to the face, three wounds on the neck, the lowest of which cut Hollinger's jugular vein, and several defensive wounds.[1] The immediate cause of death was blood loss resulting from all of the wounds. The medical examiner also testified that she had suspected the victim *488 was homosexual because the infliction of many more wounds than necessary to cause death is consistent with homosexual homicides.
Evidence submitted at trial established that there was no forced entry into the victim's home, and that the perpetrator had stolen items from the residence. Law enforcement officials testified that the house was in disarray, that stereo equipment appeared to have been stolen, and that the victim's wallet was found lying next to his body on top of the pool of blood. According to the medical examiner, the position of the victim's arms and pooling of the blood was consistent with the victim being rolled from front to back after he was down. Also found at the scene was a receipt from the Floridian Motor Hotel showing payment for the week of February 2-8, 1980,[2] and a series of bloody shoe prints and sock-clad foot impressions.[3] The victim's car was found abandoned along a nearby highway with blood on the foot pedals and driver's side floorboard, and a video cable hanging out of the passenger's door.
The Hollinger murder was classified as a cold case until it was reopened in 1994. The detective assigned to the case, Michael Ring, noticed that the social security number on the registration form for the Floridian Hotel began with a prefix whichif validwould have been issued by the Commonwealth of Massachusetts. Ring sent the unidentified prints to Massachusetts and learned that fingerprints found in the hotel room matched both Brown and Fitzpatrick, and that Fitzpatrick's prints matched those found in the victim's residence and vehicle.[4] Brown and Fitzpatrick had been incarcerated for the armed robbery of Kenneth Menard, which occurred in Massachusetts on January 30, 1980. Ring traveled to Massachusetts in June of 1995, interviewed both men, and served search warrants to obtain physical evidence from them. Fitzpatrick was subsequently charged with first-degree murder.
At trial, the State introduced evidence regarding the armed robbery of Kenneth Menard, with Menard, Brown, and Fitzpatrick each providing testimony. Brown and Fitzpatrick also testified regarding the events that occurred after the robbery of Menard. According to Brown, he and Fitzpatrick pawned the stereo they had stolen from Menard, cashed one of his personal checks, and used the funds to flee to Florida. They arrived in Tampa and paid in advance for a one-week stay at the Floridian Motor Hotel.[5] The two then commenced a drug and alcohol binge that they facilitated by stealing cars for transportation between Tampa and the bars in *489 Clearwater. They pawned the contents of the stolen vehicles for spending money.
Brown testified that he and Fitzpatrick separated one night in Clearwater with Brown choosing to remain at a party and Fitzpatrick choosing to return to Tampa. Brown averred that Fitzpatrick was not in the hotel room when he returned to Tampa, and that he was aroused by a knock at the door, which he opened to find an intoxicated Fitzpatrick who was assisted into the room by another man. According to Brown, Fitzpatrick's shoes were covered in what appeared to be red clay and the bottom of the other man's coat was covered with dirt or water. Brown stated that he awoke a second time to see Fitzpatrick throw his shoes out the window claiming that one had ripped. According to Brown, he and Fitzpatrick left the next morning and stayed with a girlfriend of Brown's aunt for three weeks prior to returning to Massachusetts.
Upon their return to Massachusetts the two were arrested and eventually incarcerated in the same correctional facility for the armed robbery of Kenneth Menard. Brown testified that while in prison, Fitzpatrick declared in the presence of two other inmates that he had sliced a man's throat while in Florida. According to Brown, Fitzpatrick claimed that he had been attacked by a homosexual in Florida and that he had stabbed his attacker in the throat.
Fitzpatrick's testimony regarding the night of Hollinger's murder differed substantially from Brown's. According to Fitzpatrick, he and Brown left Clearwater together, began to walk in the direction of Tampa, and were offered a ride by Hollinger, who requested that the three stop at his house before proceeding to Tampa. They went back to Hollinger's house where they consumed alcohol. Fitzpatrick testified that he fell asleep on the couch in the victim's living room and awoke to screams emanating from the kitchen. He testified that he saw Brown and Hollinger fighting in the kitchen, that he walked back into the living room, and that when he turned toward the kitchen again, Brown walked past him down the hall toward the bathroom. Fitzpatrick testified that when he went to check on the victim, he was in stocking feet and must have stepped in blood. He admitted that the bloody sock-clad foot impressions found at the scene were probably his, but maintained that he was not the only person in the house.[6] Fitzpatrick testified that Brown suggested stealing the victim's stereo and that the two fled the scene in the victim's car only to run out of gas on the highway. Fitzpatrick denied telling Brown that he had slit a man's throat. He could not recall whether the victim had been rolled over to obtain access to his wallet, but testified that he and Brown never discussed robbing Hollinger.

ANALYSIS
Appellant raises six issues on appeal.[7] We conclude that appellant's first *490 issue regarding the validity of the general jury verdict is dispositive and compels us to remand the case for a new trial. As a result, we do not reach the balance of appellant's claims.
The trial judge in the instant case instructed the jury on premeditated murder and felony murder with robbery and burglary as the underlying felonies. The jury returned a general verdict finding Fitzpatrick guilty of first-degree murder. Appellant argues that reversal of his conviction is warranted because the jury may have relied upon an erroneous definition of burglary as the basis for the felony murder conviction. We agree.
After return of the guilty verdict, appellant filed a motion for a new trial arguing, in part, that this Court's decision in Delgado v. State, 776 So.2d 233 (Fla.2000), invalidated the theory of felony murder based on burglary which prosecutors relied upon in his case. In Delgado, we held that where an individual enters a dwelling with consent, the burglary statute only applies if the individual remains there surreptitiously. See id. at 240. Appellant argued that the rule established in Delgado applied to his case because the evidence showed that he was a consensual invitee into Hollinger's home, but totally failed to establish that he had surreptitiously remained therein. The trial court agreed that it had erred in instructing the jury on burglary as a basis for felony murder, but denied appellant's motion for a new trial, concluding that the facts were sufficient to establish premeditated murder and felony murder based on robbery.
It is well established that a general jury verdict cannot stand where one of the theories of prosecution is legally inadequate. See Delgado, 776 So.2d at 241; see also Valentine v. State, 688 So.2d 313, 317 (Fla.1996) (invalidating attempted first-degree murder conviction which rested on alternate theories of attempted first-degree premeditated murder and attempted first-degree felony murder where this Court subsequently held that attempted first-degree felony murder does not exist in Florida). This Court recently reiterated this principle in Mackerley v. State, 777 So.2d 969 (Fla.2001), where the Fourth District Court of Appeal certified the following question of great public importance:
Is it harmless error when a defendant is convicted by general verdict for first degree murder on the dual theories of premeditation and felony murder where the felony underlying the felony murder charge is based on a legally unsupportable theory of which the defendant is nevertheless convicted, and there is evidence in the record to support the jury's finding of premeditation?
Mackerley, 777 So.2d at 969. Citing our decision in Delgado, we answered this question in the negative, quashed the decision of the district court, and remanded with instructions to reverse petitioner's conviction.
Our decisions in Delgado and Mackerley stem from the decision in Yates v. United States, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957), where the U.S. Supreme Court held that a general verdict is invalid when it rests on multiple bases, one of which is legally inadequate. See id. at 312-13, 77 S.Ct. 1064.[8] According *491 to the Yates Court, the "proper rule to be applied is that which requires the verdict to be set aside in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected." Id. at 312, 77 S.Ct. 1064. As interpreted in the high Court's subsequent decision in Griffin v. United States, 502 U.S. 46, 60, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991), the rationale underlying the Yates rule is that a jury's expertise as fact finder does not extend to determining the legality of multiple theories of prosecution. In refusing to apply the Yates rule to factually inadequate theories, the Griffin Court explained:
When ... jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error. Quite the opposite is true, however, when they have been left the option of relying upon a factually inadequate theory....
Id. at 59, 112 S.Ct. 466.
The instant case presents a slight variation on the issue addressed in Mackerley and Delgado. Here, the question is whether reversal is required where the jury was instructed on premeditated murder and felony murder, and where felony murder, in turn, was based on alternate underlying felonies, one of which is legally insufficient. We hold that the extra analytical step required in the instant case does not alter the impact of the Yates rule. We have before us a multi-part theory of prosecution, one part of which is legally inadequate, and a general jury verdict. From this information, we cannot possibly discern whether the jury convicted Fitzpatrick based on the legally sufficient grounds of premeditated murder or felony murder based on robbery, or the inadequate charge of felony murder based on burglary. It is precisely this type of uncertainty that Yates rejects. We are therefore compelled to reverse Fitzpatrick's conviction, vacate his sentence, and remand the case for a new trial.[9]

CONCLUSION
For the reasons stated above, we reverse appellant's conviction, vacate his sentence, and remand the case for a new trial consistent with this opinion.
It is so ordered.
ANSTEAD, C.J., and PARIENTE and QUINCE, JJ., concur.
LEWIS, J., concurs specially with an opinion, in which QUINCE, J., concurs.
WELLS, J., dissents with an opinion, in which CANTERO, J., concurs.
SHAW, Senior Justice, dissents.
LEWIS, J., specially concurring.
I reluctantly concur with the majority's judgment and reasoning employed with regard to the validity of Fitzpatrick's conviction. My reluctance stems from my continued belief that Delgado was wrongly decided and that the dissent in that case, with which I concurred, expressed the proper interpretation of Florida's burglary statute. However, I am respectful that the rule of law requires application of our *492 holding in Delgado to the facts of the instant case, and thereby invalidates burglary as a basis to convict Fitzpatrick for felony murder. I agree with the majority's application of this Court's holding in Mackerley and the U.S. Supreme Court's decision in Yates to the facts of the instant case, where the prosecution relied on both premeditation and felony murder based on alternate underlying felonies, one of which was legally infirm. I therefore concur with the majority's decision to reverse appellant's conviction, vacate his sentence, and remand for a new trial.
QUINCE, J., concurs.
WELLS, J., dissenting.
I dissent from the majority's reversal of the trial court's judgment and sentence based upon the trial court's jury instruction on the statutory crime of burglary. This case demonstrates how disruptive this Court's decision in Delgado v. State, 776 So.2d 233 (Fla.2000), is to the administration of justice in Florida. Though I clearly recognize and have urged adherence to the doctrine of stare decisis, appropriate application of the stare decisis doctrine requires this Court to recede from a decision when the application of that decision plainly demonstrates that it was wrongly decided. As Justice Ehrlich wisely stated in Smith v. Department of Insurance, 507 So.2d 1080 (Fla.1987), "Perpetuating an error in legal thinking under the guise of stare decisis serves no one well and undermines the integrity and credibility of the Court." Id. at 1096 (Ehrlich, J., concurring in part and dissenting in part). I believe this Court must recede from Delgado retroactively. Furthermore, it was Delgado that did not honor stare decisis. As I later set out in Delgado, this Court overturned seventeen years of precedent, beginning with Routly v. State, 440 So.2d 1257, 1262 (Fla. 1983).
When the picture of what has occurred to the law of burglary crimes comes into sharp focus, as it does with the facts of this case, the conclusion that this Court must recede from Delgado is compelling. Although the crime in the instant case was committed in 1980, the facts which resulted in the defendant's conviction did not come to light until 1994. The indictment was issued in 1996, and the defendant's trial occurred on February 14 through 18, 2000. The defendant was tried and convicted of burglary under the burglary statute that was in effect in 1980, the language of which remained substantially the same in the Florida statutes through the defendant's trial in 2000. Compare § 810.02, Fla. Stat. (1979), with § 810.02, Fla. Stat. (1999). Throughout this time period, the burglary statute stated that burglary means "remaining in" a structure with the intent to commit an offense therein. See, e.g., § 810.02, Fla. Stat. (1979). The word "surreptitious" was never in the burglary statute during this time period.
This Court first construed the "remaining in" provision of the burglary statute in Routly. In 1988, the Third District Court of Appeal expressly construed the "remaining in" provision of the statute to mean that when a defendant enters a structure with the consent of the victim and the defendant then commits a crime, the victim, upon becoming aware of the commission of the crime, "implicitly withdraws consent to the perpetrator's remaining in the premises." Ray v. State, 522 So.2d 963, 966 (Fla. 3d DCA 1988). There was no mention at all of the "surreptitiously remaining in" in either the statute, this Court's decision in Routly, or in the Third District's decision in Ray.
Following Ray, this Court again addressed the "remaining in" provision in Robertson v. State, 699 So.2d 1343 (Fla. 1997), Raleigh v. State, 705 So.2d 1324 *493 (Fla.1997), and Jimenez v. State, 703 So.2d 437 (Fla.1997) (hereinafter Jimenez I). In each of these cases, this Court approved the Third District's construction of the "remaining in" language as held in Ray. Again, there was no mention of a "surreptitiously remaining in" element in any of those decisions.
This Court issued Delgado on February 3, 2000, in which the majority receded from this Court's decisions in Robertson, Raleigh, and Jimenez I, and for the first time construed the burglary statute as having a "surreptitiously remaining in" element. Delgado, 776 So.2d at 240. On rehearing in Delgado, this Court held that the Delgado interpretation of the burglary statute was not to be applied retroactively to convictions that had become final. Id. at 241.
In the 2001 session of the Legislature, the Legislature addressed the Delgado construction of the burglary statute in a statement of intent:
810.015 Legislative findings and intent; burglary.
(1) The Legislature finds that the case of Delgado v. State, Slip Opinion No. SC88638 (Fla.2000) was decided contrary to legislative intent and the case law of this state relating to burglary prior to Delgado v. State. The Legislature finds that in order for a burglary to occur, it is not necessary for the licensed or invited person to remain in the dwelling, structure, or conveyance surreptitiously.
(2) It is the intent of the Legislature that the holding in Delgado v. State, Slip Opinion No. SC88638 be nullified. It is further the intent of the Legislature that s. 810.02(1)(a) be construed in conformity with Raleigh v. State, 705 So.2d 1324 (Fla.1997); Jimenez v. State, 703 So.2d 437 (Fla.1997); Robertson v. State, 699 So.2d 1343 (Fla.1997); Routly v. State, 440 So.2d 1257 (Fla.1983); and Ray v. State, 522 So.2d 963 (Fla. 3rd DCA 1988). This subsection shall operate retroactively to February 1, 2000.
(3) It is further the intent of the Legislature that consent remain an affirmative defense to burglary and that the lack of consent may be proven by circumstantial evidence.
§ 810.015, Fla. Stat. (2001); see also ch.2001-58, § 1 at 404, Laws of Fla. Thereafter, this Court had Jimenez v. State, 810 So.2d 511, 513 (Fla.2001) (hereinafter Jimenez II), before it for review of postconviction proceedings. In Jimenez II, this Court noted the 2001 legislative action and held that Jimenez did not receive the benefit of the Delgado decision's construction of the burglary statute because Jimenez's conviction was final (meaning affirmed on direct appeal) prior to the release of Delgado. Thus, even though this Court receded from Jimenez's direct appeal decision in Delgado, Jimenez was held not to receive the benefit of this Court's new construction of the statute. This holding was correct not only because of the Witt[10] analysis in Delgado, 776 So.2d at 241, but because "this Court's interpretation of the burglary statute in Jimenez's direct appeal," which adhered to the Robertson, Ray, and Routly construction of the "remaining in" provision, "was in harmony with legislative intent." Jimenez II, 810 So.2d at 513.
Based on this history, we presently have the following situation. We have individuals serving sentences for valid convictions of burglary and felony murder based on the burglary statute as construed by this Court prior to Delgado. Those sentences *494 are being served in conformity with a construction of the burglary statute which the Legislature has stated was as the Legislature intended. See § 810.015, Fla. Stat. (2001). Those sentences are also being served in conformity with the present application of the burglary statute for offenses committed after July 1, 2001. See § 810.02(1)(b), Fla. Stat. (2002).
Yet, we also have individuals such as the defendant in the instant case, who are convicted of committing the same elements of a crime as the individuals described above based on similar facts that occurred during the same time period, who will nonetheless have their convictions reversed because their convictions were not "final" prior to the issuance of Delgado. This is true even though the express language of the burglary statute did not change and was precisely the same express language for both those individuals whose convictions were final and those whose convictions were not final prior to Delgado. Furthermore, we have individuals who have yet to be prosecuted for burglary who will potentially receive the benefit of Delgado simply because the events leading to their prosecution were committed on or before July 1, 2001.
I recognize that it can be argued that you always have this kind of disparate treatment when a Witt analysis leads to a determination that a change in the decisional law will not be applied retroactively. But I conclude that what is truly unique in this situation is the combination of the length of time that pre-Delgado construction of the burglary statute had been applied (from Routly to Delgado was a period of seventeen years of application) and the immediate legislative action, stating that after Delgado, the pre-Delgado construction conformed with legislative intent. What has resulted is an isolated decision in Delgado that disrupts the law in its application to criminal prosecutions which were by happenstance nonfinal or the crimes not discovered when the isolated decision was issued.
One of the underlying purposes of stare decisis is that "like facts will receive like treatment in a court of law." Flowers v. United States, 764 F.2d 759, 761 (11th Cir.1985). Continuing to follow the Delgado decision, however, will result in similar facts receiving dissimilar treatment in the courts, depending solely on when an offender's conviction became final or whether the alleged criminal activities occurred on or before July 1, 2001. This dissimilar treatment effectively rewards those offenders who have evaded detection or who committed the events of their crime at an opportunistic time.
The defendant in the instant case is rewarded for evading detection from 1980 to 1994, so that he was not convicted until 2000. This defendant was obviously not on notice of the Delgado construction when he committed his crime or while he was evading detection and prosecution because the Delgado decision was not issued until nine days before this defendant's trial began. This defendant is not only rewarded by this Court's application of the burglary statute that is contrary to this Court's application of the statute in its cases issued prior to nine days before his trial began, this defendant is rewarded by an application of the statute which the Legislature has expressly stated was contrary to legislative intent.
The time has come for this Court to end this confusing and inequitable application of the law. The Third District Court of Appeal has recognized the confusion generated by Delgado and the need for this Court to expressly recede from it. See Braggs v. State, 815 So.2d 657, 660 (Fla. 3d DCA 2002) (en banc) ("Unless and until the Florida Supreme Court overrules Delgado, *495 we are obliged to follow it."), review granted, 829 So.2d 919 (Fla.2002). Judge Green's dissenting opinion in Braggs suggests that this Court has already receded from Delgado by acknowledging that Delgado was decided contrary to legislative intent. Judge Green stated:
[T]he language quoted from [Jimenez II, that "this Court's interpretation of the burglary statute in Jimenez's direct appeal was in harmony with the legislative intent,"] was clearly an additional reason offered by the court as to why Jimenez was not entitled to post-conviction relief; and not, as my colleagues in the majority suggest, a discussion of why the Delgado decision had not met the test for retroactivity. Given the Supreme Court's clear acknowledgment that Delgado was decided contrary to legislative intent, I simply do not understand how the majority remains in a quandary about whether Delgado remains good law.... I believe that the appellant's conviction for burglary with an assault should be affirmed based upon the court's pronouncement in [Jimenez II]. Although the Supreme Court did not expressly state in [Jimenez II] that it was receding from Delgado, it is quite clear that is what it did. For that reason, it is unnecessary for us to continue to blindly adhere to Delgado.

Braggs, 815 So.2d at 664 (Green, J., dissenting in part) (citation omitted); see also Foster v. State, 861 So.2d 434, 442, 2002 WL 1285453 (Fla. 1st DCA June 12, 2002).
By expressly receding from Delgado, this Court will not only be conforming our construction of the burglary statute to our prior decisions and the Legislature's construction of its statute, we will end the confusion as to the cases to which Delgado should be applied and the inequity of applying the different constructions of the statute to people who are in all regards similarly situated. This Court has the power and the obligation to correct this situation by receding from the four-to-three Delgado decision. See State v. Owen, 696 So.2d 715, 720 (Fla.1997) ("This Court has the power to reconsider and correct erroneous rulings in exceptional circumstances and where reliance on the previous decision would result in manifest injustice...."). There is really no sound reason not to do so.
CANTERO, J., concurs.
NOTES
[1] The victim had defensive wounds to his left hand, right leg, and left thigh. The medical examiner also observed marks on the victim's neck that corresponded with the application of pressure without cutting, and were consistent with someone holding a knife to the victim's neck from behind.
[2] The receipt listed "John Murphy" as the guest in room 1706. Brown later testified that both he and Fitzpatrick used false names and a false social security number to register for the room at the Floridian.
[3] The bloody sock-clad foot impressions led from the kitchen across the living room, through the master bedroom and into the bathroom to the vanity, then back in reverse order.
[4] A fingerprint expert testified that of the latent prints lifted from the crime scene, the hotel room, and the victim's vehicle, ten came back positive to Fitzpatrick (seven from the victim's residence, one from the victim's vehicle, and two from the hotel room), and two from the hotel room came back positive to Brown. Fitzpatrick's prints were located on glasses found in the victim's bedroom and living room, on the door of the bathroom in the victim's residence, outside the door frame on the passenger's side of the victim's vehicle, and on an ashtray in the hotel room.
[5] Brown stated that he paid for the hotel room and that he believed that he had received the only receipt.
[6] The State's footprint expert opined that the bloody foot impressions were consistent with Fitzpatrick's foot prints and inconsistent with those taken from other suspects, including Paul Brown.
[7] Appellant argues that the trial court erred in (i) submitting the case to the jury on premeditated murder and felony murder with alternatives of robbery and burglary where the burglary charge was legally inadequate; (ii) limiting the cross-examination of the prosecution's key witness; (iii) permitting the introduction of collateral crime evidence; (iv) failing to find and weigh certain mitigating circumstances; and (v) denying appellant's motion to declare the Florida death penalty statute unconstitutional because it permits a death recommendation by a simple majority vote. Appellant also argues that his death sentence violates the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because the aggravating circumstances necessary to impose the death sentence were neither charged by indictment nor determined by a jury.
[8] The U.S. Supreme Court subsequently overruled that portion of the Yates decision which suggested that a defendant waives his right for a judgment of acquittal by filing a motion for a new trial. See Burks v. United States, 437 U.S. 1, 18, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). Yates remains controlling authority for the proposition addressed herein.
[9] We observe that the outcome reached here has been anticipated at the district court level. The Second District Court of Appeal has confronted the identical factual scenario now before us. In Lyons v. State, 791 So.2d 36 (Fla. 2d DCA 2001), the Second District applied our decisions in Delgado and Mackerley to reverse a conviction based on premeditated and felony murder based on robbery and burglary where the burglary theory was inadequate under Delgado. See id. at 36-37.
[10] Witt v. State, 387 So.2d 922 (Fla.1980).