DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**VOLVICK VASSOR,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D15-3401

[ May 16, 2018 ]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Ilona M. Holmes, Judge; L.T. Case No. 11-019972 CF10A.

Aubrey Webb, Coral Gables, for appellant.

Pamela Jo Bondi, Attorney General, Tallahassee, and Mitchell A. Egber, Assistant Attorney General, West Palm Beach, for appellee.

TAYLOR, J.

Volvick Vassor appeals his conviction and life sentence for first-degree murder. The state prosecuted appellant for first-degree murder on dual theories of premeditation and felony murder, based on allegations that appellant was a lookout during a residential burglary that resulted in the shooting death of the homeowner, Nelson Heck. We affirm as to all issues raised and write to address appellant's argument that the trial court erred in giving jury instructions on premeditation because there was insufficient evidence to support a premeditation theory for first-degree murder.

Appellant, along with co-defendants Jaquan Jean-Baptiste and Rivky Tamar, was charged by indictment with first-degree murder for killing Heck. The state alleged that the defendants acted "with a premeditated intent to cause the death of Nelson Heck and/or Nelson Heck's death occurred as a consequence of and while [the defendants] were engaged in the commission, or attempted commission of a burglary . . . ."

The evidence at trial established the following facts. On the evening of November 15, 2011, the victim's neighbor, James Keefe, was home when

he heard sounds like gunshots nearby. He walked outside to his driveway, saw a car drive by, and then noticed the victim's front door wide open with the foyer light on. When Keefe walked over to the victim's house, he saw the victim lying face up in a pool of blood on the floor of the foyer. He contacted the Fort Lauderdale police.

During their investigation, the police learned that another neighbor had a surveillance system installed outside his residence in an apartment complex less than a quarter mile from the victim's house. The neighbor informed the police that he recorded a video around the time of the incident. The surveillance video showed two cars pull into the complex's parking lot. The video showed two men getting out of one car and entering the other car. At one point, the interior light in one of the cars was illuminated, and the neighbor saw the driver putting on gloves. The two cars then left the area. Less than five minutes later, the video captured the sound of gunshots.

Officer Erik Good watched the video multiple times, noting the physical characteristics and clothing of one occupant, later identified as appellant, who was wearing Adidas shorts. Officer Good also observed on the video a Ford Taurus or Fusion and a dark-colored, two-door Nissan Altima.

Officer Good patrolled the area in search of the vehicles and occupants he had seen on the surveillance tape. About ninety minutes after the initial call to police, and about five miles from the victim's house, Officer Good stopped a two-door, black Nissan Altima. The driver, appellant, matched the description of the man wearing Adidas shorts in the video. The officer handcuffed appellant and transported him to the police station.

At the station, officers took appellant's belongings, including his cellphone, and placed him in an interview room. One officer noticed that someone named "Gator Tom" was repeatedly calling appellant's phone, so the officer wrote down the caller's name and phone number. The phone was returned to appellant before his release from jail, and the police used both video and audio surveillance to monitor the calls he made while he was alone in the interview room.

The next day, the police located the Ford Taurus. Christopher Zetrenne's sister told the police that her brother had rented the car, which he had cleaned earlier that day. Zetrenne went to the police station, where detectives showed him photos from the surveillance video. Zetrenne admitted that he was the driver of the Ford and that appellant drove the Altima. Zetrenne denied being involved in the burglary and murder and

said they were only there to smoke marijuana. The police released him. Zetrenne later pled to accessory after the fact and received probation.

After obtaining search warrants, the police searched the Ford and the Altima, finding the victim's blood inside both cars. Through cell tower data, the police obtained records showing numerous calls between appellant, Jean-Baptiste, Zetrenne, and "Gator Tom"—later identified as Tamar—on the day before the burglary and homicide. The records further showed that on the day of the burglary and homicide, there were more than forty calls between appellant and Zetrenne, and more than twenty calls between appellant and Tamar. On the day after the burglary and homicide, there were three calls from appellant to Jean-Baptiste and three calls from Jean-Baptiste to appellant.

Appellant and co-defendant Tamar were tried together. Jean-Baptiste testified that Tamar was the shooter. Jean-Baptiste said that on the night of the burglary and shooting, Tamar and Zetrenne picked him up in a Ford Taurus. They drove to a home, where Tamar exited Zetrenne's vehicle and walked into the backyard of the home. Around this time, appellant arrived driving a Nissan Altima. When Tamar returned from the backyard, he was carrying a black shirt wrapped up in his hand with something inside. He got into appellant's Altima. The two vehicles left and met outside another house. Tamar and appellant got into the Taurus, where Jean-Baptiste and Zetrenne were already seated. The four men discussed a plan, which involved appellant and Zetrenne watching for the police while Tamar and Jean-Baptiste walked up to the door of a targeted home to check for anyone present before breaking in. Jean-Baptiste and Tamar were to then remove items from the home and place them in appellant's and Zetrenne's vehicles.

When they arrived at the victim's home, Jean-Baptiste and Tamar exited the Taurus and walked up to the door, while Zetrenne turned the vehicle around. Appellant drove off. Tamar borrowed Jean-Baptiste's phone and called someone to confirm that they were ready before they rang the victim's doorbell. When the victim opened the door, Jean-Baptiste believed Tamar saw that the victim had a gun, because Tamar pushed Jean-Baptiste toward the victim. The two struggled on the floor and the victim shot Jean-Baptiste in the hand. Tamar then grabbed the victim and started hitting him in the head with a gun. As Jean-Baptiste ran from the home, he turned to see Tamar point a gun and shoot twice. They ran to the backyard, jumped a fence, and left in Zetrenne's waiting Taurus.

The three drove back to Jean-Baptiste's neighborhood. About two or three minutes later, appellant arrived. They discussed what had

happened. Tamar told Jean-Baptiste he could not go to the hospital because they all would be incriminated. Later that night, appellant and Tamar went to Jean-Baptiste's home and discussed how police were everywhere and that they would get the bullet out of Jean-Baptiste's hand the following day. The next morning, appellant, Tamar, and Zetrenne picked up Jean-Baptiste and brought him to an apartment, where they watched the news about the shooting and used supplies from a drugstore to remove the bullet from Jean-Baptiste's hand.

During the state's case, the defense attacked Jean-Baptiste's credibility, based on his plea agreement for a reduced charge. After the state rested, defense counsel moved for a judgment of acquittal of first-degree murder, arguing that the state had failed to introduce sufficient evidence of premeditation. The trial court denied the motion.

Appellant took the stand and testified about his background and college prospects. He said he sold marijuana and was present at the scene only to handle a marijuana transaction and to give Jean-Baptiste a ride home. He denied any involvement in the burglary.

The trial court instructed the jury on first-degree murder, including both premeditation and felony murder theories. The trial court also instructed the jury on the law of principals, explaining that if a defendant helped another person commit or attempt to commit a crime, the defendant is a principal and must be treated as if he had done all the other things that the other person did, regardless of whether the defendant was present or not when the crime is committed or attempted.

The jury returned a general verdict finding appellant guilty of first-degree murder.[1]

On appeal, appellant argues that the trial court erred by giving a first-degree murder instruction on the dual theories of premeditation and felony murder where there was no evidence to support premeditation. Specifically, appellant argues that because there is no way to know upon which alternative ground the jury based its verdict, and because the evidence was legally insufficient to support a premeditation theory, the verdict must be set aside.

"It is well established that a general jury verdict cannot stand where one of the theories of prosecution is legally inadequate." *Fitzpatrick v. State*, 859 So. 2d 486, 490 (Fla. 2003). Florida courts have reiterated this

---

[1] The jury found co-defendant Tamar, who did not testify, not guilty.

principle in multiple cases. *See id.* at 490–91 (reversing the defendant's conviction for first-degree murder where the alternative theory of felony murder based on robbery and burglary was legally insufficient because entry into the victim's home was consensual, and there was no evidence that the defendant surreptitiously remained therein); *Shavers v. State,* 86 So. 3d 1218, 1222–23 (Fla. 2d DCA 2012) (reversing the defendant's general verdict conviction for first-degree murder where the jury may have relied on a felony murder theory that was legally inadequate because the jury found the defendant guilty of a lesser-included offense that was not a qualifying offense for felony murder); *Phillips v. State,* 100 So. 3d 249, 249–50 (Fla. 4th DCA 2012) (holding that a jury instruction on felony murder which set forth a predicate felony of attempted murder was legally invalid, where attempted murder had not been a predicate felony of felony murder at the time of the defendant's offense); *see also Valentine v. State,* 688 So. 2d 313, 317 (Fla. 1996) (invalidating an attempted first-degree murder conviction which rested on alternate theories of attempted first-degree premeditated murder and attempted first-degree felony murder where the court subsequently held that attempted first-degree felony murder does not exist in Florida; it was thus a legally unsupportable theory on which the jury may have relied).

Appellant argues that this principle should apply to his case because the state proceeded on two theories of first-degree murder: one which was supportable (felony murder), and the other which was not (premeditation). He contends that there was no evidence whatsoever of premeditated murder, and that the evidence at trial showed that the defendants were surprised when the victim answered the door. Appellant's case, however, is distinguishable from those cases where the general verdict was reversed because one of the alternative theories was legally inadequate.

Appellant relies on *Mackerley v. State*, 777 So. 2d 969 (Fla. 2001), to argue that the trial court erred in giving an instruction on premeditation as an alternative basis for his first-degree murder conviction. In *Mackerley,* the Florida Supreme Court considered the following certified question from our court:

> Is it harmless error when a defendant is convicted by general verdict for first degree murder on the dual theories of premeditation and felony murder where the felony underlying the felony murder charge is based on a legally unsupportable theory of which the defendant is nevertheless convicted, and there is evidence in the record to support the jury's finding of premeditation?

5

777 So. 2d at 969. In answering the certified question in the negative, the court cited its decision in *Delgado v. State*, 776 So. 2d 233 (Fla. 2000).

In *Delgado*, the defendant was convicted of two counts of first-degree murder by general verdict based on dual theories of premeditation and felony murder. 776 So. 2d at 236. The supreme court reversed the defendant's first-degree murder convictions and remanded for a new trial, holding that the underlying felony (burglary) and thus the felony murder theory were legally inadequate. *Id.* at 242. The court ruled that the state relied upon an invalid theory of burglary to support the felony murder charge. *Id.* at 236, 241–42. It explained that the "remaining in" language of the burglary statute applied only to situations where there was consensual entry and the "remaining in" was done surreptitiously. *Id.* at 240.[2] The court stated:

> This is not a case where there was merely insufficient evidence to support the burglary charge. The jury in this case was instructed that a defendant can be found guilty of burglary, even if the initial entry was consensual, if the victims later withdrew their consent. This theory of burglary was also relied on by the State as the underlying felony to support the felony murder charge. Pursuant to our analysis in today's opinion, such a theory of burglary (and felony murder) is legally inadequate.

*Id.* at 242.

*Delgado* cited *Yates v. United States*, 354 U.S. 298 (1957), wherein the United States Supreme Court "held that a conviction under a general verdict is improper when it rests on multiple bases, one of which is legally inadequate." 776 So. 2d at 242.

The *Delgado* decision noted the distinction between a legally inadequate theory and a factually insufficient theory, citing language from *Griffin v. United States*, 502 U.S. 46, 112 (1881):

> In *Griffin v. United States*, 502 U.S. 46, 112 S. Ct. 466, 116 L.Ed. 2d 371 (1991), the Supreme Court clarified that the *Yates* rule did not apply when the alternative ground was legally proper but failed because of insufficient evidence. *See*

---

[2] After *Delgado* was decided, the Florida Legislature passed section 810.015, Florida Statutes (2001), which amended the burglary statute. *See Fitzpatrick v. State*, 859 So. 2d 486, 493 (Fla. 2003).

*also San Martin v. State*, 717 So. 2d 462, 470 (Fla. 1998) ("While a general guilty verdict must be set aside where the conviction may have rested on an unconstitutional ground or a legally inadequate theory, reversal is not warranted where the general verdict could have rested upon a theory of liability without adequate evidentiary support when there was an alternative theory of guilt for which the evidence was sufficient."). The *Griffin* court explained the distinction between a legally inadequate theory and a factually insufficient theory:

> Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law–whether, for example, the action in question is protected by the Constitution, is time barred, or fails to come within the statutory definition of the crime. When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error. *Quite the opposite is true, however, when they have been left the option of relying upon a factually inadequate theory, since jurors are well equipped to analyze the evidence, see Duncan v. Louisiana,* 391 U.S. 145, 157[, 88 S.Ct. 1444, 20 L.Ed. 2d 491] (1968).

776 So. 2d at 241–42 (quoting *Griffin*, 502 U.S. at 59–60) (emphasis added).

Here, unlike in *Mackerley* and *Delgado*, neither the premeditation nor the felony murder theory rested upon a legally inadequate theory. The trial court in this case did not provide an erroneous definition of premeditation or an erroneous jury instruction, and the felony murder theory was not based on a non-qualifying underlying offense or an erroneously-defined underlying offense.[3]  *See Griffin*, 502 U.S. at 59 ("the

---

[3] The trial court instructed the jury on first-degree premediated murder, based on the following:

**MURDER- FIRST DEGREE**

7

term 'legal error' means a mistake about the law, as opposed to a mistake concerning the weight or the factual import of the evidence"). Appellant mainly challenges the sufficiency of the evidence to support premeditation for first-degree murder. However, as explained above, the relevant inquiry is not whether the state advanced a factually insufficient alternative theory, but rather whether the state advanced a legally inadequate theory. Here, the record does not show that the jury was led to rely upon a legally inadequate theory.

As the state correctly argues, *Mackerley* does not abrogate Florida's longstanding principle that a general guilty verdict may be upheld where the evidence is sufficient to establish *either* felony murder *or* premeditation. In this case, the evidence strongly supported first-degree murder based on the felony murder rule. And although the evidence of premeditation was weaker, premeditation was not a legally inadequate or an unconstitutional theory of first-degree murder. Moreover, any possible error in instructing on both theories would be harmless because the

---

There are two ways in which a person may be convicted of first degree murder. One is known as premediated murder and the other is known as felony murder.

To prove the crime of First Degree Premediated Murder, the State must prove the following three elements beyond a reasonable doubt:

1.  **Nelson Heck** is dead.

2.  The death was caused by the criminal act of **VOLVICK VASSOR AND/OR RIVKY TAMAR**.

3.  There was a premediated killing of **Nelson Heck**.

An "act" includes a series of related actions arising from and performed pursuant to a single design or purpose.

"Killing with premeditation" is killing after consciously deciding to do so. The decision must be present in the mind at the time of the killing. The law does not fix the exact period of time that must pass between the formation of the premeditated intent to kill and the killing. The period of time must be long enough to allow reflection by the defendant. The premeditated intent to kill must be formed before the killing.

The question of premeditation is a question of fact to be determined by you from the evidence. It will be sufficient proof of premeditation if the circumstances of the killing and the conduct of the accused convince you beyond a reasonable doubt of the existence of premeditation at the time of the killing.

evidence supported a conviction based on felony murder. *See Crain v. State*, 894 So. 2d 59, 75 n.16 (Fla. 2004) ("Because we determine that the evidence is sufficient to support a first-degree felony murder conviction, we decline to directly address Crain's argument that the evidence is insufficient to establish first-degree premeditated murder. Any error in instructing the jury on premeditated murder based on insufficient evidence of premeditation is necessarily harmless."); *Jones v. State*, 748 So. 2d 1012, 1024 (Fla. 1999) ("[E]ven if the evidence does not support premeditated murder, any error in charging the jury on that theory is harmless where the evidence supports a conviction for felony murder, which has also been charged."). In other words, we need not reach the issue of the sufficiency of the evidence supporting premeditation because there was ample evidence supporting the felony murder theory. *See Brown v. State*, 644 So. 2d 52, 53 (Fla. 1994).

In sum, because the state presented two legally adequate grounds for first-degree murder, premeditation and felony murder, and there was competent substantial evidence supporting felony murder, the trial court did not reversibly err in instructing the jury on both theories of first-degree murder. Any error is necessarily harmless. Accordingly, we affirm appellant's conviction and sentence.

*Affirmed.*

WARNER and DAMOORGIAN, JJ., concur.

\* \* \*

***Not final until disposition of timely filed motion for rehearing.***

9